**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| GREGORY P. BOOR and CYNTHIA L. GORMAN, and all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>PRINCIPAL FINANCIAL GROUP, INC., PRINCIPAL LIFE INSURANCE COMPANY; BENEFIT PLANS INVESTMENT COMMITTEE; and BENEFIT PLANS ADMINISTRATION COMMITTEE,<br><br>Defendants. | CIVIL ACTION NO. 1:26-cv-11597 |

**CLASS ACTION COMPLAINT**

Plaintiffs Cynthia L. Gorman and Gregory P. Boor individually and as representatives of a class of similarly situated persons bring this action on behalf of current and former participants in the Principal Select Savings Plan ("Plan") against Principal Financial Group, Inc. ("Principal Financial"), the Principal Life Insurance Company ("Principal Life"), Benefit Plans Investment Committee and the Benefit Plans Administration Committee and the Principal managers who were its members (collectively, "Defendants" or "Principal").

**NATURE OF THE ACTION**

1. The Plan is a 401(k) retirement plan for the workers at one of America's largest financial services companies, which has over $4 billion in assets. American retirement plans with more than $4 billion in assets pay an average of "all-in" fees (including investment management fees as well as other fees) of 10 to 25 basis points. (A basis point is .0001 and is the standard unit for measuring fees in the retirement plan investment industry.) (*See* https://policysmart.com/401k-fees-whats-reasonable-a-cfos-guide-to-benchmarking-costs-in-mid-market-and-large-companies/ (last viewed August 26, 2026).) Plaintiffs through the Plan paid, all told, substantially more than this in fees to Defendants in connection with their retirement investments.

2. Defendants are fiduciaries to the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and they decide what fees investors in the Plan such as Plaintiffs will pay and to whom, and they also decide what investments will be sold to Plaintiffs and the proposed Class here through the Plan. The Plan's administrator is responsible for the control and administration of the Plan. The Plan administrator here is Defendant Benefit Plans Administration Committee ("BPAC"). For the purposes of investment of Plan assets, the named fiduciary of the Plan is Defendant Benefit Plans Investment Committee ("BPIC" – and, when BPIC here is referenced together with BPAC, the "Plan Committees"). The Plan is

funded through a trust fund that holds group annuity contracts issued by Defendant Principal Life and collective investment trusts (CITs) issued by Principal Global Investors Trust Company ("PGITC"), an indirect wholly owned affiliate of Defendant Principal Financial. (*See* https://www.sec.gov/Archives/edgar/data/1126328/000110465923074829/tm2319696d2_11k.htm (last viewed August 26, 2026).) Executives of Principal appoint the Plan-related committee members. The Plan Committees that are Defendants here are staffed by Principal managers who answer to the CEO. And Principal pays the salaries and bonuses of the Plan's committee members. In other words, the Plan Committees that are Defendants here are not independent of Principal. The Plan Committees ensured that almost all of the investments offered by the Plan were provided through Principal affiliate firms, which significantly benefited the Principal family of companies (a large part of which appears here as Defendants) while financially damaging Plaintiffs and the proposed Class here as set forth at more length below.

3. Defendant Principal Life acts according to Plan documents as the primary investment manager for the pooled separate accounts in which the Plan largely invests. Principal Life charges many Plan investors a substantial investment management fee for that service. But Principal acting on behalf of the Plan hired "subadvisors" other than (and in addition to) Principal Life to do the essential work of portfolio management concerning the investments at issue here. Defendant Principal Life, in other words, charged Plaintiffs and the proposed Class here substantial investment management fees with respect to certain Plan investments that others (viz, subadvisors) did most of the work managing.

4. Principal Life keeps the instant investment management fees concerning certain sub-advised separate account funds through the Plan. In certain instances the Plan could go straight to the instant subadvisor for the same service, cutting out Principal Life as a middleman as

concerns these funds, and pay less than what they pay now for the investment management services at issue with millions of dollars of annual savings for Plaintiffs and the proposed Class. But that did not happen here.

5. ERISA requires Defendants, who are legal fiduciaries to Plaintiffs and the proposed Class here, to act solely in the interest of the Plan's participants when making decisions about selecting, removing, replacing and monitoring the Plan's investments and vendors. ERISA also requires Defendants to minimize the Plan's expenses. Rather than fulfilling these fiduciary duties, described as "the "highest known to the law,"[1] by offering Plaintiffs and other participants in the Plan investment options and plan administration services at reasonable cost, Principal and its managers on the Plan Committees chose and maintained for the Plan Principal-branded investment products and plan administrative services with high fees and frequently poor investment performance (as was the case, for instance, with the Principal-brand target date funds and with the Principal Large Cap Growth I separate account fund sold to Plaintiffs through the Plan).

6. Defendants chose and maintained the Principal-brand proprietary investment products and plan administration services they chose for the Plan because Principal, its subsidiaries, and its officers benefited financially from the monies paid by Plaintiffs and the proposed Class in Plan-related investment fees and revenues to Principal. Defendants breached their ERISA legal duties of loyalty and prudence to Plaintiffs and the proposed Class by engaging in these acts of self-dealing (which benefited Defendants while harming Plaintiffs) as set forth at more length below.

[1] *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quotations omitted).

7. This is a civil enforcement action under ERISA, and in particular under ERISA §§ 404, 406, 409, 502(a)(2), 29 U.S.C. §§ 1104, 1106, 1109, 1132(a)(2). Plaintiffs bring this action on behalf of the Plan for losses to the Plan and for disgorgement of unlawful fees, expenses and profits taken by Defendants for the benefit of Principal and themselves.

8. This class action is brought on behalf of participants and their beneficiaries in the Plan who participated in the Plan beginning six years before the filing of this Complaint ("Class Period").

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants maintain substantial business offices in this district and thus may be "found" here and Plaintiff Cindy Gorman also resides in this District after having worked in Defendants' Downers Grove corporate office for years. (*See* https://www.principal.com/about-us/our-company/worldwide-locations/regional-locations/chicagoland/locations-financial-professionals (last viewed August 27, 2026).) According to Principal's website, the company has nine separate offices in Illinois – in Downers Grove, Joliet, LaSalle, Lemont, Orland Park, Rochester, Springfield and St. Charles (where Principal has two offices) – and does business here as "Principal Financial Network of Chicagoland [, which] is part of the nationwide affiliated group of financial professionals who work with the Principal Financial Group." (*See*

https://www.principal.com/about-us/our-company/worldwide-locations/regional-locations/chicagoland/locations-financial-professionals (last viewed August 27, 2026).)

## PARTIES

### I. Plaintiffs

12. Plaintiff Gregory P. Boor ("Boor"). Plaintiff Boor is a resident of Huxley, Iowa. Boor participated in the Plan during the Class Period and invested in funds established and managed by Principal through his account in the Plan during the Class Period.

13. Plaintiff Cynthia L. Gorman ("Gorman"). Plaintiff Gorman is a resident of Westmont, Illinois. Gorman worked in Defendants' Downers Grove, Illinois office and participated in the Plan during the Class Period and invested in funds established and managed by Principal through her account in the Plan during the Class Period.

### II. Defendants

14. **Principal Financial**. Principal Financial is an ERISA fiduciary here by reason of being the Plan's named plan sponsor in the Plan's U.S. Department of Labor Form 5500 filings and also by reason of the discretionary authority and control it exercised at all times during the Class Period over Plan assets. Principal Financial is located in Des Moines, Iowa

15. **Principal Life**. Principal Life is a life insurance, retirement plan recordkeeping and investment services company and a subsidiary of Principal Financial. Principal Life is an ERISA fiduciary here because it administers the pooled separate accounts in which the Plan invests and also by reason of the discretionary authority and control it exercised at all times during the Class Period over Plan assets. Principal Life is located in Des Moines, Iowa.

16. Principal Financial directly or indirectly appoints, monitors, and removes the members of the Plan Committees, which run the Plan as described below.

17. **Benefit Plans Administration Committee.** ("Administrative Committee"). The Administrative Committee is responsible for administering the Plan. The Administrative Committee is a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan. The Administrative Committee exercised responsibility for selecting administrative service providers to the Plan and thus had discretionary authority or discretionary responsibility in the administration of the Plan and the disposition of its assets in the form of fees paid to such service providers. The members of the Administrative Committee are officers or managers at Principal or of one of its affiliates.

18. **Benefit Plans Investment Committee.** ("Investment Committee"). The Investment Committee is responsible for investing and protecting the Plan's assets and is a fiduciary for those purposes. The Investment Committee is a fiduciary of the Plan under 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan and the disposition of the Plan's assets. The members of the Investment Committee are officers or managers at Principal or of one of its affiliates.

## <u>FACTS</u>

### I. The Plan.

19. The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

20. The Plan is a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

21. The Plan covers eligible employees of Principal and its subsidiaries and affiliates.

22. The Plan had 17,454 total participants and beneficiaries as of December 31, 2024.

23. The Plan had total assets valued at approximately $4.59 billion as of December 31, 2024. The Plan is funded through a trust fund that holds group annuity contracts issued by Principal Life, and the trustees of the trust that hold these group annuity contracts are employees of Principal Life. (*See* https://investors.principal.com/static-files/26898d7e-6e30-4304-93e4-0ffb56956f18 (last viewed September 14, 2026).)

24. The Investment Committee was responsible for selecting, evaluating, monitoring, and maintaining the Plan's investment options.

25. The Administrative Committee and/or the Investment Committee was responsible for selecting, evaluating, monitoring and maintaining the Plan's administrative service providers.

26. During the Class Period, the Plan invested in the following funds:

- Principal-brand guaranteed interest accounts ("GIC")
- Principal SmallCap Value II Separate Account
- Principal U.S. Property Separate Account
- Principal Core Plus Bond Separate Account
- Principal Diversified International Separate Account
- Principal Large-Cap Stock Index Separate Account
- Principal Government and High Quality Bond Separate Account
- Principal Mid-Cap Separate Account
- Principal Global Emerging Markets Separate Account
- Principal Diversified Real Asset Separate Account
- Principal Inflation Protection Separate Account
- Principal Large-Cap Growth I Separate Account
- Principal Blue Chip Separate Account

- Principal Small-Cap Growth I Separate Account
- Principal Small-Cap Stock Index Separate Account
- Principal Equity Income Separate Account
- Principal Mid-Cap S&P 400 Index Separate Account
- Principal Lifetime Hybrid 2015 Collective Investment Trust
- Principal Lifetime Hybrid 2020 Collective Investment Trust
- Principal Lifetime Hybrid 2025 Collective Investment Trust
- Principal Lifetime Hybrid 2030 Collective Investment Trust
- Principal Lifetime Hybrid 2035 Collective Investment Trust
- Principal Lifetime Hybrid 2040 Collective Investment Trust
- Principal Lifetime Hybrid 2045 Collective Investment Trust
- Principal Lifetime Hybrid 2050 Collective Investment Trust
- Principal Lifetime Hybrid 2055 Collective Investment Trust
- Principal Lifetime Hybrid 2060 Collective Investment Trust
- Principal Lifetime Hybrid 2065 Collective Investment Trust
- Principal Lifetime Hybrid 2070 Collective Investment Trust
- Principal Lifetime Hybrid Income
- SEI Trust Company Prin/BR Aggregate Bond Index
- SEI Trust Company Prin/BR International Equity Index.

The Plan also allows Principal workers to invest in Principal company stock and in a Schwab Funds self directed brokerage account if they so elect.

27. The funds other than the SEI Trust Company funds and Principal company stock are collectively referred to as "Principal Investment Options."

## II. The Plan Invested Almost All of its Assets in Principal Investment Options.

28. Not counting the Principal company stock option and the two SEI Trust Company funds, the Plan invested exclusively in Principal-brand investment options during the Class Period.

29. There are many non-Principal-branded, reasonably-priced and well-managed investment options in the 401(k) plan marketplace available to the Plan. Such options include registered mutual funds, exchange-traded funds, non-registered commingled funds such as bank collective or common trusts and insurance company pooled separate accounts and separately-managed single client funds.

30. No one investment management firm is good at everything. Some investment management firms are renowned for managing fixed income investment products, others are notable for equity investment products and still others are prominent in managing international and emerging market products. Fiduciaries for large retirement savings plans understand this, and thus carefully and diligently search among various vendors to construct a suitable and appropriately low-cost and diversified array of investment options when assembling menus of retirement plan investment options for their retirement plan investors.

31. Here, however, Defendants offered Plaintiffs and other investors in the Plan as their retirement investment options almost exclusively Principal investment funds. Defendants as ERISA fiduciaries of the Plan knew or should have known that no single investment management firm provides best-of-class investment fund offerings across in all asset classes.

32. In making their decision to limit virtually all investment options to Principal Investment Options, Defendants placed their self-interest in maximizing fees for the Defendant Principal entities instead of choosing investment options that were in the best interests of Plan participants.

## III. Defendants Charged Plan Participants Unreasonable and Excessive Separate Account-Related Investment Management Fees.

33. Retirement plans the size of the Plan have substantial bargaining power in the market for retirement plan investment products. This among other things is because jumbo-sized retirement plans can aggregate their assets under management when they bargain with investment portfolio managers over fees for managing retirement plan savings.

34. Put differently, a prudent and loyal fiduciary for a jumbo-sized retirement plan like the Plan here would use the bargaining power conferred by the plan's billions in investable dollars to negotiate low fees from investment managers.

35. That is not what happened here.

36. The Plan featured an array of Principal-branded pooled separate accounts during the Class Period as investment options for Plaintiffs and the proposed Class here. A pooled separate account is a commingled investment fund with an investment strategy generally matching its name.

37. Some of these separate accounts hold a portfolio of securities directly. Others simply invest in an underlying mutual fund established and marketed by Principal affiliates ("Principal Mutual Fund(s)"). Various investment management, administrative and other fees are charged to Plaintiffs by Defendants via the Principal Investment Options offered through the Plan.

38. Most Principal-branded separate account funds in the Plan have an "investment advisor" and one or more "subadvisors." Some of these arrangements occur at the separate account level for those Principal Investment Options that hold securities directly and some at the level of the underlying Principal Mutual Fund in instances where the Principal Fund simply invests in such a mutual fund.

39. For example, the Blue Chip Separate Account identifies Principal Life as the Advisor and Principal Global Investors, LLC ("PGI") as the subadvisor. The portfolio managers

of each Principal Fund who actually manage the money in each fund are employed by the subadvisor. Thus, in each case, the core service of a given Principal Fund, portfolio management, is provided by the subadvisor, not the named investment advisor. Put another way, the subadvisor makes the decisions about which securities to buy, sell or hold.[2] These arrangements for the Plan's investments are illustrated below in Table 1.

**TABLE 1**

| Separate Account name | Investment Manager | Sub-Advisor |
|---|---|---|
| Principal Blue Chip SA-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal Core Plus Bond Sep Acct-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal Diversified Intl SA-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal Equity Income SA-Z | Principal Life Insurance Company/Principal Asset Management | Principal Global Investors |
| Principal Govt & HQ Bond SA-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal Inflation Protect SA-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal LargeCap Growth I SA-Z | Principal Life Insurance Company | Principal Global Investors/T.Rowe Price/Brown Adviso |
| Principal LgCp S&P 500 Index SA-NE | Principal Life Insurance Company | Principal Global Investors |
| Principal MidCap S&P 400 Index SA-NE | Principal Life Insurance Company | Principal Global Investors |
| Principal MidCap Sep Acct-Z | Principal Life Insurance Company | Principal Global Investors |
| Principal SmCap Growth I Sep Acct-Z | Principal Life Insurance Company | Principal Global Investors/AB/Brown/Emeral d |
| Principal SmCap S&P 600 Index SA-NE | Principal Life Insurance Company | Principal Global Investors |
| Principal SmCap Value II Sep Acct-Z | Principal Life Insurance Company | Principal Global Investors/Vaughan Nelson /Hotchkis & Wiley |

[2] *See, e.g.*, https://www.cwcadvisors.com/sub-advisory ("A sub-advisor provides investment management support under a defined mandate, typically handling portfolio construction, monitoring, and research led updates. The advisor retains the client relationship and planning responsibilities. The sub-advisor's role is to deliver consistent investment decisions and documentation that supports communication.") (last viewed September 8, 2026).

| | | |
|---|---|---|
| Principal Div Real Asset SA-Z | Principal Life Insurance Company | Principal Global Investors & Multiple Sub-Advisors |
| Principal U.S. Property SA-Z | Principal Life Insurance Company | Principal Real Estate Inv |
| Principal Global Emerging Markets SA-Z | Principal Life Insurance Company | Principal Global Investors |

40. The subadvisors for these separate accounts also often offer portfolio management services directly to institutional investors as separately-managed single-client accounts. This means that Defendants here as the Plan's ERISA fiduciaries could likely have negotiated investment management arrangements directly with the subadvisors to the various Principal separate accounts held by the Plan without paying Principal Life what amounts to baksheesh or an access fee for serving as the investment manager on five specific separate account funds for which other, non-Principal Life entities do the actual investment management. But Defendants as ERISA fiduciaries did not do this for the Plan.

41. Instead, Defendants for five of the separate accounts offered through the Plan chose to have participants in the Plan pay additional fees yearly to Principal Life for investment management even though the subadvisors for these funds (and not Principal Life) are the ones who actually manage these funds on a day-to-day basis.

42. This below is referred to as a retained investment management fee by Principal Life; it is present in the separate accounts that are listed below in Table 2 (which is based on 2024 Plan data, including the Form ADV filed by Principal that year).

**TABLE 2**

| **Principal Fund** | **Expense Ratio** | **Sub Advisor Fee Per Form ADV** | **Principal Retained Management Fee** | **Principal Percent of Management Fee Retained** |
|---|---|---|---|---|
| Principal Core Plus Bond Sep Acct-Z | 0.26% | 0.20% | 0.06% | 23.08% |

| | | | | |
|---|---|---|---|---|
| Principal Govt & HQ Bond SA-Z | 0.24% | 0.15% | 0.09% | 37.50% |
| Principal SmCap Value II Sep Acct-Z | 0.66% | 0.45% | 0.21% | 31.82% |
| Principal U.S. Property SA-Z | 0.80% | 0.55% | 0.25% | 31.25% |
| Principal Global Emg Mkts Sep Acct-Z | 0.74% | 0.60% | 0.14% | 18.92% |

43. Defendants knew the Plan could have bargained directly with the subadvisors for these five funds, since among other things Principal (in theory, at least) negotiates with the subadvisors for these funds over their fees. Principal knows the so-called investment break points and fee schedules involved with these funds, and several of the subadvisors involved here (including PGI) are Principal affiliate companies. Thus, Defendants knew that the investment services they maintained for the Plan in these funds could be available at a lower cost than the cost the Plan and the proposed Class of participants in it here actually paid for those investments. Under these circumstances and as set forth at more length below, the retained investment management fees paid by the Plan and Plan participants like Plaintiffs to Principal Life here as regards these five funds was "more than reasonable compensation" that was paid to "parties in interest" (*i.e.*, Defendants and specifically Defendant Principal Life) and thus a prohibited transaction violation under ERISA in addition to being a fiduciary breach of the duties of loyalty and prudence that ERISA imposes on plan sponsors, service providers and committee members like Defendants. These retained investment management fees benefited Principal Life financially while providing no countervailing benefit to the Plan and Plaintiffs.

## IV. Defendants Sold Poorly Performing Principal-Brand Target Date Funds with Unreasonable Fees to Plaintiffs Through the Plan.

### A. TDF Basics.

44. Launched in 2009, the Principal target date funds offered in the Plan ("TDFs") are a series of asset allocation funds maintained as collective investment trusts, which are pooled investment vehicles maintained by a bank or trust company available exclusively to retirement plan customers.

45. A target date fund is a diversified investment providing exposure to a variety of asset classes that is comprised mostly of equity and fixed income securities with an investment mix that becomes less risky as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the retirement plan participant to choose the target date that aligns with his or her estimated retirement date. The Principal TDFs included in the Plan consist of collective investment trust options with a target date ranging from 2015 to 2070 (2015, 2020, 2025, etc.), and an option called Principal LifeTime Hybrid Income CIT designed for investors "who have reached their investment time horizon."

46. At all relevant times the Principal TDFs have been managed using a fund-of-funds structure, meaning that the TDFs' assets are invested in other pooled investment products, which, according to the Declaration of Trust for the TDFs, can be mutual funds, collective investment trusts and annuity separate accounts, among other options. During the relevant time period, the fees of each Principal TDF consisted of four components: (a) a trustee fee of .03%, which is set by the Declaration of Trust for the TDFs; (b) operating expenses, which are deducted from the trust; (c) a service fee, which varies based upon the share class selected in the participation agreement relating to these funds, which ranges from 0 bps to 29 bps; and (d) the fees charged by the underlying investments in the instant Principal TDF.

47. Because Principal TDF investors like Plaintiffs bear the expense of the underlying investment options, Defendants' decisions regarding which underlying investment options to use as the so-called underlying funds here directly determined the amount of fees paid by Principal TDF investors like Plaintiffs, and those choices also impacted the investment performance of these funds relative to benchmarks and target date funds offered by unaffiliated (i.e., non-Principal) fund vendors.

**B. The Principal TDFs' Asset Allocation Strategy.**

48. The Principal TDFs' investment process is described in their sales literature.[3] First, Defendants determined which asset classes would make up the TDFs. Second, Defendants determined the percentage allocations to each of these asset classes throughout the investor's investment lifespan. This gradually shifting asset allocation is known as the "glide path" for a series of target date funds. Third, Defendants constructed each Principal TDF's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers."[4]

49. As part of this third step, Defendants determined that four asset classes should be represented through passively-managed investment portfolios, commonly known as "index funds": (1) large company domestic equities ("large cap stocks") would be represented by an index fund tracking the Standard & Poor's 500 Index ("S&P 500 Index"); (2) fixed income securities ("bonds") would be represented by an index fund tracking the Bloomberg Barclays Aggregate Bond Index; (3) midsize company domestic equities ("mid cap stocks") would be

[3] *See, e.g.*, 2024 Brochure at 6; Principal Trust[SM] Target Date Collective Investment Funds brochure at 2-5 (May 2014), available at https://www.principal.com/allweb/docs/ris/investments/profile/1/pj_1052.pdf (hereinafter "2014 Brochure").

[4] 2014 Brochure at 4.

represented by an index fund tracking the S&P MidCap 400; and (4) small company domestic equities ("small cap stocks") would be represented by an index fund tracking the S&P SmallCap 600 Index. Throughout the relevant period, Defendants have used index funds tracking these specific indices to provide exposure to these four asset classes, and these four index funds have represented 60 to 70 percent of the total assets of each of the Principal TDFs.

50. The marketplace for both target date funds and index funds is highly competitive. For most major market indices, one or more investment management companies offer an index fund product that can track the index with a high degree of accuracy while charging very low fees.

51. Defendants, though, did not invest in any of the competitive index fund offerings in the marketplace in constructing the asset base of the Principal TDFs, choosing instead to profit themselves and their affiliates by investing almost exclusively in Principal's proprietary index funds as the TDFs' underlying funds despite the Principal index funds having fees that were higher than marketplace alternatives that tracked the exact same index. Not only were the Principal index fund products at issue here far more expensive than available non-Principal index fund products, but they were also of significantly lower quality. Compared to marketplace alternatives, Principal's index funds deviated further from the benchmark index and consistently had the worst performance even on a pre-fee basis as set forth below.

52. Given the high fees and history of poor performance of Principal's index funds, a prudent and unconflicted ERISA fiduciary running a multi-billion dollar suite of target date funds (as Defendants do here) acting in the best interest of investors in these funds like Plaintiffs would not have chosen those Principal proprietary index finds and would have removed these proprietary index funds from the Principal TDFs and replaced them with more competitive marketplace

alternatives. Defendants' failure to do so cost Plaintiffs and other TDF investors in the Plan here millions in investment losses compared to what they would have earned had Defendants acted in accordance with their ERISA duties while earning Defendants many millions in fees.

53. Defendants' failure to exercise the level of prudence and loyalty expected under the circumstances is best illustrated by contrasting their conduct to that of other, similarly situated ERISA fiduciaries who managed target date collective trust funds for retirement plans during the same time frame. Fiduciaries of numerous other target-date collective investment trusts invested during the relevant time period in non-proprietary index funds as the underlying holdings in their target date fund series despite the fact that each of these financial services companies also offers their own proprietary indexing products or services in the marketplace. In fact, no major target date managers aside from Principal itself used Principal's index funds as underlying holdings in their target date funds during the relevant period.

### C. Defendants' Use of Unduly Expensive Share Classes in the TDF's "Underlying Funds."

54. Defendants' failure to manage prudently and loyally the underlying investments of the Principal TDFs was not limited to index fund selection. Defendants also intentionally selected higher-fee versions of proprietary actively managed funds to increase Defendants' fee revenue at the expense of Plan participants and TDF investors like Plaintiffs here. Under the Declaration of Trust for the TDFs in the Plan, Defendants were permitted to invest in collective investment trusts, mutual funds, annuity separate accounts and other vehicles in assembling the underlying funds for the TDFs. For many of the Principal-affiliated investments selected by Defendants, Principal offered both mutual fund and annuity separate account versions. Each of these vehicles contained identical investments but varied significantly in terms of costs. Principal also offered different

share classes of each of these different vehicle, with the primary difference being the costs associated with each share class.

55. Investment in the lowest-cost share class generally requires the investor to meet a minimum investment requirement. These minimums were easily met in this case. While many investors might have been constrained as to which vehicle or share class they could own due to contractual limitations, regulatory constraints or a limited asset base, Defendants did not face any of these constraints in managing the Principal TDFs given the asset base of the Principal TDFs, the resulting negotiating power and the language within the Declaration of Trust pertaining to the TDFs permitting ownership of various investment products.

56. As a fiduciary, Defendants "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (*en banc*). Yet Defendants did exactly that by intentionally selecting more expensive vehicles and share classes of underlying funds managed by Principal, not because of any benefit they conferred upon Plaintiffs and others who invested in these TDFs through the Plan, but because of the additional fees Defendants and their affiliates received from these more expensive options.

### D. Defendants' Management of the TDFs Caused The TDFs to Have Poor Investment Returns.

57. These imprudent investment decisions were not the result of mere negligence or oversight. To the contrary, Defendants consistently invested the assets of the Principal TDFs in costly and underperforming Principal-branded funds and failed to timely remove those funds long after a reasonable investigation would have revealed the availability of lower cost, better performing options. Defendants' wrongdoing consistently earned Defendants and their Principal

corporate affiliates additional investment management fees and provided a larger asset base to make Principal's index fund and mutual fund products more competitive in the retirement investment marketplace.

58. By managing the Principal TDFs in this fashion, Defendants caused the TDFs to make lower investment returns than they would have had they been prudently and loyally managed in the best interests of Plaintiffs and others who invested in these TDFs through the Plan.

59. As described above, throughout the relevant period, the Principal TDFs had 60 to 70 percent of their assets—at all times over $1 billion—invested in index funds that tracked the S&P 500; the Bloomberg Barclays U.S. Aggregate Bond Index; the S&P Midcap 400; and the S&P Small Cap 600. Each of the Principal TDFs has been invested in all four of these index funds, with the average Principal TDF having usually around 40% of its assets in the large cap index fund, 15% of its assets in the bond index fund, 4% in the midcap index fund, and 4% in the small cap index fund.

60. There are numerous investment managers in the marketplace (including BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard) that, throughout the relevant period, offered products tracking one or more of these same four indices with a high degree of precision while charging very low fees. With over $1 billion in assets to invest here on behalf of Plaintiffs and the proposed TDF class, Defendants had sufficient size and bargaining power to qualify for the cheapest share class of any of these products.

61. Defendants failed to investigate these marketplace alternatives, choosing instead to further their own self-interest by using proprietary index fund products from Principal to track all four indices. Defendants utilized Principal's index funds despite the fact that they charged fees that were significantly higher than the fees charged by more competitive options.

62. Not only were the Principal index funds more expensive than other available options, but they were of significantly lower quality than the other options when it came to their sole function—tracking the underlying index. For the past decade or more, Principal's index funds have consistently had among the highest rates of tracking error among their peers.[5]

63. This self-interested and faulty portfolio management predictably produced poor investment performance. Principal documents from 2025[6] show, for instance, that the Principal LifeTime Hybrid 2040 TDF that Plaintiff Gorman owned during the Class Period through the Plan trailed one of its Plan-designated benchmarks—*viz*, the S&P Target Date 2040 Index—for the three-month, year-to-date, one-year, three-year, five-year and ten-year performance reporting periods (in other words, for every provided performance measurement period). As set forth here, this long-running underperformance of the TDFs as a matter of investment return relative to benchmarks chosen by Principal itself owes in significant part to excessive fees that Defendants extract from TDF investors like Plaintiffs and the proposed classes here at the underlying fund level, where Defendants consistently choose to use their own proprietary index fund and managed

[5] See *PBIJX Principal Bond Market Index Fund*, Principal Asset Management, https://www.principalam.com/us/fund/pbijx(last accessed Apr. 13, 2026); *PNIIX Principal Bond Market Index Institutional Class*, Morningstar (Feb. 28, 2026), https://www.morningstar.com/funds/XNAS/PNIIX/quote; Erich Pingel et al., *A Bond Index Fund's Balancing Act: Tracking Error and Cost*, Vanguard (Mar. 2025), https://corporate.vanguard.com/content/dam/corp/research/pdf/a_bond_index_funds_balancing_act_tracking_error_and_cost.pdf; *Understanding the Nuances of Bond Index Fund Tracking*, Vanguard (Apr. 22, 2025), https://workplace.vanguard.com/insights-and-research/perspective/understanding-the-nuances-of-bond-index-fund-tracking.html; *FXNAX Fidelity U.S. Bond Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/316146356 (last accessed Apr. 13, 2026); *Fidelity U.S. Bond Index Fund SEC Yield is TRAILING*, Bogleheads.org (Oct. 4, 2021), https://www.bogleheads.org/forum/viewtopic.php?t=359466; *SWAGX Schwab U.S. Aggregate Bond Index Fund*, Charles Schwab, https://www.schwabassetmanagement.com/products/swagx (last accessed Apr. 13, 2026).

[6] 2025 was the last year of the proposed Class Period during which Plaintiff Gorman owned one of the Principal TDFs through the Plan.

fund products to be the underlying funds of the TDFs rather than superior and less expensive funds offered by non-Principal investment fund complexes. These fees from the underlying funds significantly and wrongfully reduced the investment returns of the TDFs for Plaintiffs and the proposed classes here.

64. Institutional factors also demonstrate the superiority of passive managers other than Principal. Vanguard has been managing index fund investments for almost 50 years and manages over $8 trillion in index funds. State Street has been managing index fund investments for 32 years and manages over $5 trillion in index funds. BlackRock manages over $6.5 trillion in index funds. Each company offers over 100 different passive investment strategies. By comparison, Principal in total, manages less than $800 billion in assets and has only been managing index fund investments since the year 2000.[7]

**E. Defendants' Disloyal and Imprudent Use of Principal-Brand Index Funds as the Underlying Funds for the TDFs: Good for Principal's Corporate Bottom Line but Bad for Plaintiffs and the Plan.**

65. To demonstrate Defendants' failure to prudently and loyally manage the Principal TDFs' index fund investments, below is a performance chart covering the years 2018 through 2024 for the Principal Large Cap S&P 500 Index Fund used by Defendants and several other S&P 500 index fund products used by the fiduciaries of other target-date fund collective investment trusts, and the average over/under performance during those years. Other columns show the average

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| Principal Large Cap S&P 500 Index Separate Account | -4.83% | 30.95% | 17.88% | 28.10% | -18.43% | 25.74% | 14.55% | 13.42% | 0.30% | 0.13% |
| Blackrock Equity Index NL F | -4.40% | 31.47% | 18.35% | 28.65% | -18.10% | 26.20% | 14.71% | 13.84% | 0.05% | 0.02% |
| Northern Trust S&P 500 Index Fund- NL- Tier J | -4.49% | 31.48% | 18.38% | 28.68% | -18.12% | 26.25% | 14.82% | 13.86% | 0.06% | 0.03% |
| Vanguard Institutional Index (VIIIX) | -4.38% | 31.49% | 18.40% | 28.71% | -18.11% | 26.29% | 14.77% | 13.88% | 0.03% | 0.02% |

[7] *Principal Financial reports $717.9 billion in assets under management,* Investing.com (Apr. 17, 2025, 06:17 AM), https://www.investing.com/news/sec-filings/principal-financial-reports-7179-billion-in-assets-under-management-93CH-3990191.

annual tracking error during the time period and the annual fee for each product as of December 31, 2024.

66. The chart shows that year after year, the Principal S&P 500 index option significantly underperformed compared to peer index fund competitors as follows:

- Average Performance Between 3.1% to 3.4% worse
- Average Tracking Error Between 5 to 10 times worse
- Fee Between 4.33 to 6.5 times higher

Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly-situated fiduciaries, there was ample evidence during every year of the relevant period that the Principal option should have been replaced with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed.

67. The underperformance of Principal's S&P 500 index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P 500 index tracking. As of September 2014, Principal managed less than $20 billion of assets in S&P 500 index products, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $138 and $400 billion in products tracking the S&P 500.[8] These companies' dominance in the field of S&P 500 index tracking dates back to before the beginning of the relevant period and continues today. Additionally, these four companies have all been managing S&P 500

[8] These market numbers are as of December 31, 2024. The chart further shows that the Principal option had the highest level of tracking error during this six-year period and the highest fees as of December 31, 2024.

index-tracking products since the late 1970s, while Principal did not launch an S&P 500 index-tracking strategy until 2000.[9]

68. Defendants' disloyal and imprudent index fund management was not limited to the S&P 500 index fund used by the Principal TDFs. Defendants also used a proprietary Principal[10] index fund that tracked the Bloomberg Barclays U.S. Aggregate Bond Index, despite the fund's historical underperformance and the availability of several marketplace alternatives that tracked the exact same index with lower tracking error, better historical performance on a pre-fee basis and fees that were 3 to 4 times lower than the fees charged by Principal.

69. Below is a performance chart covering the years 2018 through 2024 for the Bloomberg Barclays U.S. Aggregate Bond Index itself, the Principal Bond Market Index Fund used by Defendants and several other index fund products that track the Bloomberg Barclays U.S. Aggregate Bond Index that were used by the fiduciaries of other target-date fund collective investment trusts. The chart also shows the average annual tracking error for each bond index fund product as well as each product's annual fee as of December 31, 2024.

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| Bloomberg Barclays US Aggregate Bond Index | 0.00% | 8.45% | 7.67% | -0.60% | -14.36% | 6.36% | 2.88% | 1.49% | N/A | 0.00% |
| Principal Bond Index Separate Account | 0.00% | 8.00% | 7.10% | -1.10% | -14.80% | 5.93% | 2.41% | 1.08% | 0.30% | 0.14% |
| Blackrock US Debt Index NL F | 0.30% | 8.45% | 7.67% | -0.73% | -14.36% | 6.08% | 2.57% | 1.43% | 0.05% | 0.04% |
| Northern Trust Aggregate Bond Index Fund NL Tier J | 0.00% | 8.43% | 7.65% | -0.52% | -14.45% | 6.06% | 2.78% | 1.42% | 0.06% | 0.07% |

70. The chart shows that year after year, the Principal bond index option significantly underperformed both its benchmark index and index fund competitors in the marketplace as follows:

[9] Hewitt Index Fund Report at 4. Data from Morningstar shows that as of the end of 2017, Principal had $21 billion in S&P 500-tracking assets under management, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $148 and $645 billion.
[10] Mercer Index Fund Report at 25.

| | | |
|---|---|---|
| • | Average Performance | Between 24% to27.6% worse |
| • | Average Tracking Error | Between 5 to six times worse |
| • | Fee | Between 2 to 3.5 times higher (excluding Bloomberg, which charged zero) |

Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target-date fund TDFs, they would have replaced the Principal bond index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above. But they did not do so because Defendants were able to earn unreasonably remunerative fees from using Principal's own proprietary investment products as the underlying funds for the TDFs instead.

71. The underperformance of Principal's bond index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of passive fixed income management. BlackRock, Northern Trust and Vanguard have all been managing passive fixed income assets for over thirty years, while Principal's bond index fund is roughly half as old. And as of the end of 2024, Principal managed $6.5 billion in Bloomberg Barclays Aggregate Bond Index-tracking products (excluding monies invested by the Principal TDFs), while Northern Trust, BlackRock and State Street all managed between $3 and $300 billion in products tracking the same index.

72. This self-serving use of proprietary index funds is underscored by Defendants' historical conduct in managing the Principal TDFs' bond holdings. Prior to 2013, one of the Principal TDFs' underlying holdings was a bond index CIT managed by BNY Mellon that charged a fee of 0.06% per year. In 2013, Defendants replaced the BNY Mellon bond index CIT with the Principal Bond Index fund despite the fact that BNY Mellon managed both of these funds (acting as the advisor to its own product and the subadvisor to Principal's bond index product),

and the Principal option charged fees that were 2.5 times higher than the BNY Mellon option. Given that the funds tracked the exact same index and had the exact same managers, there does not appear to be any justification for this change other than to increase the fee revenue received by Defendants and their Principal affiliates and to increase the asset base of Principal's bond index fund, all directly at the expense of participant investors like Plaintiffs.

73. Defendants' use of a proprietary index fund product to track the S&P Midcap 400 Index was similarly disloyal and imprudent. Again, throughout the relevant period, Defendants used a proprietary Principal index fund to track the S&P Midcap 400 despite the availability of marketplace options with superior long-term performance on a pre-fee basis, lower tracking error and lower fees. Below is a chart showing the annual performance from 2018 to 2024 of the S&P Midcap 400 Index itself, the Principal MidCap S&P 400 Index Fund used by Defendants in the Principal TDFs and several other index fund TDFs that track the S&P Midcap 400 Index and were used by the fiduciaries of other target-date fund collective investment trusts. The chart also shows the average tracking error of each product during this period as well as each product's annual fee as of December 31, 2024.

74. The chart shows that year after year, the Principal midcap index option significantly underperformed both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal option had the highest level of tracking error, 5 to 10 times higher, as well as the highest fees among these options. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| S&P MidCap 400 Index | -11.08% | 26.20% | 13.66% | 24.76% | -13.06% | 16.44% | 13.93% | 10.12% | N/A | 0.00% |
| Principal MidCap S&P 400 Index Sep Acct | -11.50% | 25.60% | 13.10% | 24.10% | -13.40% | 15.90% | 13.30% | 9.59% | -0.30% | 0.25% |
| Blackrock Mid-Cap Equity Index NL F | -11.12% | 26.15% | 13.63% | 24.70% | -13.08% | 16.40% | 13.85% | 10.08% | 0.05% | 0.04% |
| State Street S&P MidCap Index NL-Cl A | -11.20% | 26.00% | 13.60% | 24.60% | -13.10% | 16.30% | 13.04% | 9.89% | 0.10% | 0.05% |
| Northern Trust S&P MidCap 400 Index Fund- NL- Tier J | -11.09% | 26.18% | 13.65% | 24.74% | -13.07% | 16.42% | 13.90% | 10.10% | 0.04% | 0.10% |

date fund TDFs, they would have replaced the Principal mid-cap index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed here.

75. The underperformance of Principal's mid cap index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P Midcap 400 index tracking. BlackRock, Northern Trust, and State Street all had more years of experience with mid-cap indexing than Principal during the relevant period. According to data from Morningstar, as of the end of 2024, Principal managed $1.2 billion in assets tracking the S&P MidCap 400 Index (excluding monies invested by the Principal TDFs), while Northern Trust, BlackRock, and State Street all managed between $3 and $120 billion in products tracking the same index.[11]

76. Defendants' use of the Principal proprietary small cap index product was similarly imprudent. While few investment managers offer a product that tracks the S&P SmallCap 600 Index, Vanguard began offering such a mutual fund in 2010, and as the chart below shows, it would have been a superior option for participants.

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| S&P SmallCap 600 Index | -9.75% | 20.86% | 9.57% | 25.27% | -17.42% | 13.89% | 8.63% | 7.29% | N/A | 0.00% |
| Principal SmallCap S&P 600 Index Sep Account | -10.20% | 20.20% | 8.90% | 24.60% | -17.90% | 13.30% | 8.45% | 6.76% | -0.30% | 0.21% |
| Vanguard S&P Small Cap 600 | -9.80% | 20.80% | 9.50% | 25.20% | -17.45% | 13.85% | 8.63% | 7.25% | 0.03% | 0.03% |

[11] BlackRock and State Street in particular stand out as having achieved superior economies of scale to Principal. As of the end of 2024, according to data from Morningstar, Northern Trust managed $2 billion in assets tracking the S&P MidCap 400 Index, while both BlackRock and State Street managed between $37 to $100 billion in assets tracking this index. Principal had $1.2 billion in assets tracking the S&P MidCap 400 Index.

77. The chart shows that year after year, the Principal small-cap index option significantly underperformed the Vanguard index fund competitor (between 7.2% to 7.8% worse). The chart further shows that the Principal option had higher tracking error (ten times worse) and that the tracking error was chronically negative. Institutional factors also favored Vanguard, given its experience and expertise in index tracking, and given that Vanguard managed at least four times more small-cap-600 index tracking assets as of the end of 2024. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly situated fiduciaries, they would have replaced the Principal small cap index option with the corresponding Vanguard option.

78. The fact that Principal's index fund options were annuity separate accounts while the marketplace alternatives were collective investment trusts or mutual funds is not a material distinction. Though the legal structure of the Principal index funds is that of an annuity separate account, the investments themselves did not offer any actual insurance-like features. Defendants used an annuity separate account vehicle because that happens to be the index fund vehicle that Principal offers in the marketplace, not because use of that vehicle conferred any benefit upon Principal TDF participants compared with using an index fund operated as a collective investment trust or mutual fund. This is demonstrated by the fact that Defendants also used proprietary collective investment trust and mutual fund vehicles as holdings within the Principal TDFs.

79. Defendants benefited in multiple ways from the use of proprietary index funds within the Principal TDFs. In addition to the fees earned by Defendants, Principal's TDF assets help subsidize the operating costs of Principal's index funds, making them more profitable to Principal. The impact on Principal's business interests has been substantial: more than half of the

assets in Principal's large cap, mid cap, small cap and bond index funds come from the Principal TDFs.

### F. Principal Breached Its ERISA Fiduciary Duties to the Plan by Using High-Cost Versions of Principal's Index Funds as the Asset Base for the TDFs.

80. Defendants breached their ERISA duties by utilizing more expensive versions of Principal-affiliated underlying investments in the TDFs despite the availability of identical, but lower cost, investment vehicles and share classes. This failure directly resulted in higher investment fees earned by Defendants and their affiliates at the expense of participants like Plaintiffs, who paid higher fees and experienced worse investment performance as a result of Defendants' imprudence and self-dealing.

81. As described above, for every investment used by a collective investment trust using a fund-of-funds structure such as the TDFs, a prudent fiduciary will investigate whether the trust can use its size and negotiating power to qualify for otherwise identical lower-cost investment vehicles and share classes.

82. Defendants failed to investigate and utilize such lower-cost vehicles, in several instances using Principal-affiliated mutual funds as investments within the Principal TDFs despite the availability of lower-cost (but otherwise identical) annuity separate accounts managed by Principal. For example, Principal's MidCap S&P 400 Index mutual fund (PMFMX) has a higher expense ratio than its separate account equivalent, yet the mutual fund has been used within the Target Date Funds despite the availability of the lower-cost option.

83. Defendants cannot argue there was a qualitative difference between the two vehicles. Defendants' own sales literature represents that they act as an ERISA fiduciary in their management of annuity separate accounts, that substantial resources have gone into the careful review and ongoing monitoring of their annuity separate accounts and that Principal's annuity

separate accounts constitute appropriate investments for an ERISA fiduciary. Principal Investment Fiduciary Support Services Brochure at 3.[12]

84. For example, at all relevant times, the Principal TDFs have used the mutual fund version of the Principal Diversified International Fund when an identical version of this investment was available as an annuity separate account, which is called the "Z share" version of this fund and which carries lower fees than the mutual fund version.

85. Below is a chart for 2018 to 2024 comparing the performance of the Principal Diversified International mutual fund used by the Principal TDFs with Z shares of the Principal Diversified International annuity separate account. It demonstrates that not only not only did the annuity separate account have lower fees (over 45% lower) but also had consistently superior performance (10.5% higher) on a pre-fee basis.

| | Annual Performance for years: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Fee |
| Principal Diversified International Annuity Separate Account - Z shares | -13.12% | 22.34% | 9.87% | 10.65% | -16.76% | 13.45% | 8.92% | 5.05% | 0.39% |
| Principal Diversified International Mutual Fund I Shares | -13.45% | 21.90% | 9.42% | 10.10% | -17.20% | 12.90% | 8.35% | 4.57% | 0.85% |

86. This was not the only instance in which Defendants used higher-cost investments despite the availability of identical, lower-cost vehicles. All of the Principal TDFs used the Principal International Emerging Markets mutual fund, which as of the end of 2024 charged expenses of 1.02% per year. Defendants used this investment despite the availability of Z shares that charged expenses of 0.39% at the end of 2024.

[12] *Terms and Conditions for ERISA 3(21) Serv. for Defined Contribution Plans and Defined Benefit Plans provided by Wilshire,* at 3 (2022), https://secure02.principal.com/publicvsupply/GetFile?fm=pq10986&ty=VOP&EXT=.VOP (last accessed Apr. 13, 2026).

87. The chart below shows, again, how Defendants also used higher-cost, lower-performing mutual fund vehicles for the Short-Term Income, Global Diversified Income and Inflation Protected Securities investments despite the availability of lower-cost but otherwise identical annuity separate account options.

| Mutual Fund Used in Principal LifeTime Hybrid Target Date Funds | Fee | Lower Cost Separate Account | Fee |
|---|---|---|---|
| Principal Short Term Income Fund (PSHIX) | 0.45% | Principal Short-Term Income Separate Account | 0.25% |
| Principal Global Diversified Income Fund (PGDIX) | 0.65% | Principal Global Diversified Income Separate Account | 0.35% |
| Principal Inflation Protection Fund (PIPIX) | 0.50% | Principal Inflation Protection Separate Account | 0.30% |

88. These decisions not only resulted in Defendants and their affiliates earning higher fees, but they also benefitted Principal's mutual fund business by helping to subsidize the costs of complying with the Investment Company Act of 1940 and providing superior economies of scale. For example, according to Principal Funds' Statement of Additional Information, as of February 6, 2018, 55.99% of the assets of the Principal Diversified International mutual fund were invested in the Principal TDFs. Assets from the Principal TDFs made the Principal Diversified International mutual fund and other Principal mutual funds more profitable to Defendants and their affiliates.

89. Defendants also failed to investigate and utilize the lowest-cost share class of many of the investments held by the Principal TDFs. As discussed above, prudent fiduciaries will use their size and negotiating power to qualify for the lowest-cost available share class of an investment vehicle. The lowest-cost share class for Principal's annuity separate account investments is Z shares, and the lowest-cost share class of Principal's mutual funds are R6 shares. Yet Defendants consistently used the I5 share class for annuity separate accounts and Institutional shares for the mutual funds held by the Principal TDFs. For example, Defendants utilized Institutional shares of the Principal High Yield mutual fund, with annual expenses of 0.61%, despite the availability of R6 shares, which cost only 0.53% per year (15% lower). Similarly,

Principal used I5 shares of the large cap, mid cap, and small cap index fund annuity separate accounts despite the I5 shares charging fees that were materially higher than the fees charged by otherwise-identical Z shares.

90. Investing in these more expensive vehicles or share classes did not confer any benefit upon participants investing in the Principal TDFs. There were no revenue sharing payments that were credited to participants involved here, and though some participating plans were paid service fee credits, these amounts were nominal and ultimately flowed to the benefit of Defendants and their affiliates, as these fee credits were used to pay recordkeeping fees to Principal.

91. Plaintiffs did not have knowledge of all material facts (including, among other things, availability of less expensive and better performing alternative investments, the availability of lower-cost investment vehicles and share classes, the relatively greater experience, expertise, and asset base of Principal's competitors in the index fund marketplace, and the investment performance of underlying Principal TDF investments versus other specific alternatives) necessary to understand that Defendants breached their duties in violation of ERISA here until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the selection and monitoring of investment options within the Principal TDFs (including Defendants' processes and motivations for selecting, monitoring, evaluating, and removing investments) because this information is solely within Defendants' possession prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth in this Complaint.

## V. Principal Breached Its ERISA Fiduciary Duties by Offering the Principal LargeCap Growth I Separate Account as an Investment Option in the Plan Given Its Consistently Poor Investment Returns.

92. Plaintiff Gorman owned the Principal LargeCap Growth I Separate Account during the proposed Class Period here. According to its Principal fund fact sheet, this separate account "seeks long-term growth of capital. Under normal circumstances, the fund invests at least 80% of its net assets, plus any borrowings for investment purposes, in growth equity securities of companies with large market capitalizations. The fund also invests in equity securities of companies with medium market capitalizations. The fund is "non-diversified."

93. The LargeCap Growth I Separate Account currently uses three subadvisors, one of which is PGI per Table 1 above.

94. PGI at all times exercised discretionary control and authority over Plan assets in its role as subadvisor here and thus was an ERISA fiduciary as well as being a party in interest with respect to the LargeCap Growth I Separate Account.

95. Reminiscent of the Principal TDFs' poor performance record discussed above, the LargeCap Growth I Separate Account according to its Principal fund fact sheet dated March 31, 2026, trailed its appointed benchmark (which was chosen by Defendants here), the Russell 1000 Growth Index, on a (then-) year-to-date basis as well for the three-month, year-to-date, one-year, three-year, five-year and ten-year performance reporting periods (again, for every provided performance measurement period).

96. Similarly, in a July 2, 2026, analyst report, the investment analysis firm Morningstar (arguably the world's leading investment fund rating and analysis firm) observed that for 2025 (which was the last year during the proposed Class period here in which Plaintiff Gorman owned the LargeCap Growth I Separate Account through the Plan), the fund "finished

in the large-growth Morningstar Category's bottom quartile that year, ***an ignominious distinction that Principal wants this strategy to avoid***."[13]

97. Discussing the fund's poor performance, Morningstar noted in its report that the fund uses an "untested way to manage risks" and observed that despite being explicitly a large capitalization-focused equity growth fund, the LargeCap Growth I Separate Account has "in recent years . . . struggled to provide effective exposure to large-growth stocks." The report states that the fund has "generally struggled" since 2022 on account of one of the fund's sub-advisors, Brown Advisory, keeping the overall portfolio "light on many of th[e] influential stocks" of the "handful of mega-cap companies [that] began to dominate the large-growth market" around 2022. Morningstar rated the fund in this report "Below Average" as concerns both its risk and its return components relative to its investment category while rating it "Very Aggressive" for its portfolio risk score.

98. Given the demonstrated imprudence of this fund's chosen investment strategy and dire performance record (much of which, in a stroke of dark irony, happened during a market period when most large-cap growth stocks were spectacularly thriving), Defendants at all times during the proposed Class Period knew or should have known that the LargeCap Growth I Separate Account was not a prudent investment option for Plaintiffs and the Plan here – especially given the surfeit of low-priced and better-performing large-cap growth funds offered by non-Principal investment vendors available in the marketplace. (*See, e.g.*, https://www.morningstar.com/stocks/8-top-performing-large-growth-funds (discussing eight large cap growth funds offered by firms other than Principal with superior performance records

[13] https://www.morningstar.com/funds/xnas/plgix/analysis (last viewed September 8, 2026) (emphasis added).)

for 401(k) investors) (last viewed September 8, 2026); https://money.usnews.com/investing/articles/best-performing-401-k-funds (same; also noting that as a sector, "large-cap growth has been the star of the past decade") (last viewed September 8, 2026).) To be blunt, given how bad this fund is, the only reason for Defendants to have offered it as a Plan investment option to Plaintiffs and the proposed Class is because Defendants made more money by doing so than by offering an unaffiliated large-cap fund in the Plan instead – a striking display of disloyalty for fiduciaries like Defendants who owe legal duties to Plaintiffs and the proposed class here under ERISA that are "among the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 269-72 (2nd Cir. 1982).

## CLASS ACTION ALLEGATIONS

99. 29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action to obtain the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

100. Plaintiffs assert their claims on behalf of a class of Plan participants and beneficiaries defined as follows: **All participants and beneficiaries of the Plan at any time on or after September 18, 2020**.

101. Numerosity: The Class is so numerous that joinder of all Class members is impracticable. During the relevant period, the Plan had tens of thousands of participants.

102. Typicality: Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs invested in the Principal TDFs during the Class Period, and Plaintiff Gorman also invested in the Large Cap I separate account offered by the Plan; Plaintiffs suffered injuries as a result of the mismanagement of and improper and unreasonable fees imposed by

Defendants' handling of those funds. Defendants' imprudent and disloyal decisions affected all Class members similarly.

103. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with those of the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

104. Commonality: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a. Whether Defendants are parties in interest under ERISA;

b. Whether Defendants breached their ERISA fiduciary duties by investing the assets of the Principal TDFs in Principal-affiliated underlying funds;

c. Whether Defendants breached their ERISA fiduciary duties by failing to leverage the size and negotiating power of the Principal TDFs to procure the lowest-cost share class of each of the underlying investments of the Principal TDFs;

d. Whether Defendants breached their ERISA fiduciary duties by causing the Plan to offer the LargeCap Growth I separate account fund as an investment option;

e. whether Defendants were fiduciaries to the Plan under ERISA;

f. whether Defendants committed prohibited transactions concerning the Plan by failing to control Principal Life's separate account fees in violation of ERISA;

g. whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of their ERISA duties;

h. if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

i. what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

j. whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

105. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

106. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of participants' plan assets that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

107. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is

relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## CAUSES OF ACTION

## COUNT I

### ERISA PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST

(Violation of § 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1))
(On Behalf of Plan Investors in the Principal Core Plus Bond Separate Account, Principal Government & High Quality Bond Separate Account, Principal Small Cap Value II Separate Account, Principal U.S. Property Separate Account and the Principal Global Emerging Markets Separate Account)

108. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

109. ERISA § 406(a)(1), 29 U.S.C. § 1106(a), prohibits ERISA fiduciaries from causing plans, such as the Plan here, to engage in certain transactions with parties in interest.

110. As alleged herein, Defendants pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14), are fiduciaries and parties in interest under ERISA by dint of their roles, variously, as administrators, service providers and/or investment managers to the Plan and its participants (including Plaintiffs) invested in the separate accounts offered by the Plan.

111. Under ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction

constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

112. Under ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

113. Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

114. Here, Defendant-fiduciaries caused the Plan to engage in numerous transactions with parties in interest to the Plan, in violation of ERISA § 406(a)(1)(C)–(D), 29 U.S.C. § 1106(a)(1)(C)–(D), including by having Principal Life as "investment manager" collect and retain investment management fees for these five separate account funds in the Plan when the separate accounts' subadvisors rather than Principal Life handled the portfolio management of the Class's investments in these funds, thereby generating unreasonable fees and other profits that benefited Defendants (who are all parties in interest here under ERISA) at the expense of Plaintiffs and the Class.

115. Defendants as alleged herein caused Plaintiffs and the Plan to engage in transactions with parties in interest that were for more than reasonable compensation and/or were on terms less favorable than those offered to other shareholders.

116. Defendant-fiduciaries caused the Plan and the proposed classes to engage in these prohibited transactions even though Defendants knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and

ERISA-covered parties in interest and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest (viz, Defendants) of the assets of the Plan.

117. As a direct and proximate result of Defendants' prohibited transaction violations, Plaintiffs and the Plan and its investors in these separate accounts directly or indirectly paid millions of dollars in investment-related fees and revenues to Defendants, thereby resulting in millions of dollars in losses to the Plan and its participants and/or unjust profits for the benefit of the parties in interest.

118. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all unjust profits obtained in violation of 29 U.S.C. § 1106(a)(1) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT II

### Breach of ERISA Fiduciary Duties of Loyalty and Prudence

(Violation of 29 U.S.C. § 1104(a)(1)(A)–(B), (D))
(On Behalf of Plan Investors in the Principal TDFs and in the LargeCap Growth I Separate Account)

119. Defendants are or were fiduciaries of the Plan as defined by 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

120. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their management of the Plan and its administrative and recordkeeping expenses.

121. The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for prudently and loyally

selecting appropriate funds for the Plan and Plaintiffs on an ongoing basis and taking all necessary steps to ensure that the Plan's assets are invested prudently and in a low-cost manner.

122. As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring and performing the investment management of the TDFs and the LargeCap Growth I Separate Account fund used by the Plan. As concerns the TDFs, Defendants imprudently and disloyally followed a fiduciary process that resulted in Defendants choosing to use higher-cost Principal-brand underlying funds for the asset base of the TDFs despite the availability of better yet less expensive investment products offered by unaffiliated retirement plan services providers. Similarly, Defendants as part of their fiduciary process concerning the LargeCap Growth I Separate Account fund chose to use untested risk management strategies and deficient investment-selection protocols (as set forth above), which predictably caused the LargeCap Growth I Separate Account to perform poorly during the proposed Class Period here even though most of the proposed Class Period was a period in capital markets history where large-cap stocks were as a group hugely successful investments. Defendants followed these fiduciary processes and strategies to benefit themselves at the expense of Plaintiffs and the Plan.

123. Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Defendants. Through these actions and omissions, Defendants failed to discharge their fiduciary duties solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

124. Each of the above actions and omissions demonstrate that Defendants failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then

prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

125. Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good the losses resulting from the aforementioned breaches, to restore any profits Defendants made through the use of ERISA plan assets, and to disgorge any profits earned as a result of the fiduciary breaches alleged in this Count.

126. Each Defendant knowingly participated in the breach of one or more of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as representatives of the Plan pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have committed prohibited transactions and breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good all losses resulting from the breaches of their ERISA duties described above;

E. An accounting for profits earned by Defendants and a subsequent order requiring Defendants to disgorge all profits improperly earned from, or in respect of, Defendants' management of the separate accounts in the Plan during the relevant period;

F. An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all ERISA plan assets transferred to Defendants as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Defendants to prevent their unjust enrichment from unlawful transactions involving the assets of the Plan;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H. An award of pre-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

J. An award of such other and further relief as the Court deems equitable and just.

Dated: September 18, 2026

Respectfully submitted,

By: /s/ Katarina Carroll

Katarina Carroll
**CARROLL SHAMBERG, LLC**
200 N. LaSalle, Suite 1650
Chicago, IL 60601
Telephone: (872) 215-6205
Email: katrina@csclassactions.com

Steven A. Schwartz*
**CHIMICLES SCHWARTZ KRINER**

**& DONALDSON-SMITH**
One Haverford Center
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 645-4712
Email: sas@chimicles.com

-and-

Garrett Wotkyns*
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH**
18146 North 93rd Place
Scottsdale AZ 85255
Telephone: (480) 3130506
Email: gww@chimicles.com

Tom Kherkher*
**ELLZEY, KHERKHER,**
**SANFORD MONTGOMERY LLP**
4200 Montrose Street
Suite 200
Houston, TX 77006
Telephone: (713) 244-6363
Email: tkherkher@eksm.com

Josh Sanford*
**ELLZEY, KHERKHER,**
**SANFORD MONTGOMERY LLP**
10800 Financial Center Parkway
Suite 510
Little Rock, AR 72211
Telephone: (713) 244-6363
Email: jsanford@eksm.com

*Attorneys for Plaintiffs and the Putative Class*

* *pro hac vice forthcoming*